# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Nan R. Nolan | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 03 C 251 | **DATE** | 12/28/2004 |
| **CASE TITLE** | Valarie Parris vs. Jo Anne Barnhart | | |

**MOTION:**  [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing [held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference [held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial [set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs [by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry]  For the reasons stated in the attached Memorandum Opinion and Order, plaintiff's motion for summary judgment or remand is granted. Defendant's motion for summary judgment is denied. This matters is remanded to the Social Security Administration pursuant to 42 U.S.C. 405(g) for further proceedings consistent with the attached opinion.

(11) ■ [For further detail see

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | **2** | **Document Number** |
| | No notices required. | | number of notices | |
| ✓ | Notices mailed by judge's staff. | | DEC 28 2004 | |
| | Notified counsel by telephone. | | date docketed | **20** |
| | Docketing to mail notices. | | *IS* | |
| | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | 12/27/2004 | |
| | | | date mailed notice | |
| hmb | courtroom deputy's initials | | hmb | |
| | | | mailing deputy initials | |
| | | Date/time received in central Clerk's Office | | |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION



DEC 2 8 2004

| | | |
|---|---|---|
| VALARIE PARRIS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 03 C 0251** |
| | ) | **Magistrate Judge Nan R. Nolan** |
| JO ANNE B. BARNHART, | ) | |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Valarie Parris seeks review of the denial of her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416, 423. This matter is before the Court on the parties' cross-motions for summary judgment. The Commissioner seeks an order affirming the decision to deny Parris' DIB application. Parris asks the Court to reverse the Commissioner's decision and remand her claim for a new hearing. For the reasons explained below, Parris' motion is granted and the Commissioner's motion is denied. This matter is remanded to the Social Security Administration pursuant to sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion.

## PROCEDURAL HISTORY

Parris claims that she became unable to work on December 31, 1995, due to a spinal disorder causing neck, head, and radiating arm pain, numbness and weakness in both hands and arms, headaches, and sudden loss of balance. (R. 97) Parris also suffers from tinnitus and hearing loss in her left ear. (R. 156)

Parris applied for disability insurance benefits on November 23, 1999. (R. 97) Her application was denied initially on February 14, 2000 and again on reconsideration on April 3, 2000. (R. 78-81, 84-86) The Commissioner found that although Parris' medical history showed "a history of back injury as well as tinnitus," it did not show that the conditions were disabling. (R. 84) Parris appealed and requested an administrative hearing, which was held before Administrative Law Judge ("ALJ") John L. Mondi on January 9, 2001. (R. 39-75, 87-89) On April 24, 2001, the ALJ found that Parris was not disabled because her conditions, even in combination, did not constitute a "severe" impairment. (R. 21) Alternatively, the ALJ found that Parris was not disabled because she could perform light, unskilled work of the type she had previously performed as a health club receptionist. (R. 20) On November 6, 2002, the Appeals Council denied Parris' request for review. (R. 5-6).

## FACTUAL BACKGROUND

Parris, born on October 22, 1948, was 52 years old on the date of the ALJ's decision. (R. 44) She has an Associate's Degree in Fine Arts, which she completed in 1975. (R. 44, 120) She has worked as a YWCA resident artist and publicity consultant, a picture framer, a receptionist in a health club, a floral designer, and an artist. (R. 123-128).

A.     **Medical Evidence**

On October 25, 1993, Parris lost her balance and fell at work, fracturing her left knee. (R. 217) She stated she began suffering from loss of balance, neck pain, headache and nausea shortly after the fall. (R. 167)

Dr. Richard Weiner treated the fractured knee. (R. 213) Parris wore a long leg Velcro cast, used crutches, and attended physical therapy for several weeks. (R. 213-16) She stated that she discontinued physical therapy because it worsened her neck pain and headaches and

aggravated a previous injury in her right foot. (R. 218) Parris reported that Dr. Weiner told her that the knee would probably remain painful and there was no more to be done about it. Id.

During December of 1993, Dr. Ronald Woods, a chiropractor, treated Parris' back pain, neck pain, and headaches with chiropractic adjustment. (R. 217-218) Parris reported that Dr. Woods "made good progress reducing both the severity and frequency of the headaches, the neck pain was reduced, and the lower back pain was pretty well resolved." (R. 218) Dr. Woods released Parris in April of 1994. When her headaches started to get worse, Parris saw Dr. Rocco Pellegrino, a chiropractor.

In July of 1994, Dr. Pellegrino conducted an "independent examination at the request of Parris' carrier." (R. 217) Parris reported to Dr. Pellegrino that she experienced radiating pain down her left arm to the elbow and numbness in her left hand and forearm, which had worsened during the previous six months. (R. 218) Dr. Pellegrino believed that a mid-cervical injury was causing radiation of pain and numbness to the left upper extremity which was not progressing under chiropractic treatment. (R. 220) He noted some diminished strength in the Triceps and wrist extensors of Parris' left arm. (R. 219) Dr. Pellegrino also observed "palpable tenderness and swelling over the left mid cervical lamina." (R. 219) Cervical and foramina compression both elicited pain, with the latter causing increased radiation of pain to the left upper arm. Id. A lack of supportive musculature caused Parris to sit holding her head downward, "with the posture of one with very weak upper back muscles." Id. Range of motion testing caused increased reported pain and "palpable protective myospasms around the left mid Cervical region." Id. Dr. Pellegrino diagnosed "Cervical sprain with Cervical Brachial Syndrome." (R. 220) He concluded that Parris was not disabled by her injuries at that time. (R. 221) Dr. Pellegrino recommended a further evaluation by a neurologist or physiatrist "to differentiate

between nerve root and discal causation." (R. 220)

Dr. William Gogan, an orthopedic surgeon, ordered an MRI of Parris' cervical spine in January 1995 which revealed "a small midline posterior disc protrusion or herniation at C7-T1." (R. 232). At C5-6, Parris had a "small lateral disc protrusion on the right" and "mild anterior spondylosis." Id. While the MRI irregularities were consistent with Parris' complaints of chronic neck and right arm pain, "the dizziness and loss of balance would be hard to pin down to just the herniated discs." (R. 229) Dr. Gogan referred Parris to an ear, nose and throat surgeon for further evaluation of her balance problems. Id.

Dr. Friosky, an otolaryngologist, saw Parris on March 3, 1995. (R. 233) He used a syringe to drain a hematoma on Parris' scalp, caused by a fall four days prior. Id. Parris told Dr. Friosky that she experienced ringing in the ears that resolved with chiropractic adjustment. Id. Dr. Friosky recommended "a complete audiometric evaluation plus ENG and ABR." (R. 234) Parris underwent ABR testing that month that was within normal limits. (R. 182) An audiogram obtained at that time revealed "predominantly high frequency left sided moderate sesorineural hearing loss." Id.

Parris continued to complain of left knee pain. (R. 224) An MRI of the left knee on November 16, 1995 was normal. (R. 239) In March of 1996, neurologist Dr. Rodrigo Ubilluz noted that Parris complained of suffering from "very intense" headaches which were exacerbated by moving her head or raising her arms above her head since October 1993. (R. 204) She reported suffering from loss of balance and weakness in both hands. (R. 204-05) Parris also stated she experienced tingling in her right arm and pain in her right elbow, and had difficulty holding onto objects with her right hand. Id. Physical examination confirmed a slightly "decreased proprioception" with the right upper extremity and a lit bit more marked with the

-4-

right lower extremity, a decrease of sensation to pinprick in the region of the fifth and half of the fourth digits in the hands "and somewhat also in the medial aspect of the forearm." (R. 205) Pain was triggered by pressing on the right elbow. (R. 205) Physical examination revealed gross hearing loss caused by a "conductive problem" to the left ear. (R. 205)

Dr. Ubilluz's assessment was "most likely cervical vertigo due to the sprain/strain of the cervical neck which may be impairing the sensory neural input, and since there is a mismatch between the sensory input, she becomes dizzy in a very unspecific way." (R. 205-06) He ordered an MRI of the brain, an EEG, and an evoked potential of the upper extremities, all of which were normal. (R. 201-03, 206) An MRI of the cervical spine revealed "no evidence of cervical spine bone marrow pathology. Mild spondylosis with mild disc narrowing and mild disc dehydration at C5-C6. Mild posterior disc bulge is present at base level. Bilateral neural foraminal narrowing is apparent; greater on the right side. Mild posterior disc bulge is also apparent at the C6-C7 level, and no evidence of intrinsic pathology of the cervical section of the spinal cord." (R. 199) These findings confirmed Dr. Ubilluz's previous diagnosis of cervical vertigo producing disequilibrium. (R. 199) Although he noted that the cervical MRI did not explain all of Parris' symptoms, like her left knee pain, "at least it addresses the most important of the symptoms which is the atypical dizzy spells the patient is still having." (R. 199) He recommended use of a cervical collar, Benadryl every eight hours, see a psychologist, and maybe an ENT consultation with audiometry to check for the left ear hearing loss. (R. 197)

Dr. Ubilluz's diagnosis was confirmed by Doctors Shelton, Humphreys, and Iravedra at the National College of Chiropractic, who diagnosed "cervical segmental dysfunction secondarily resulting in disturbed equilibrium" in June, 1996. (R. 170) These doctors did not review the cervical MRIs or the brain CT. (R. 171). The doctors recommended continued

chiropractic care and a rehabilitation program to strengthen the extensor muscles of the back and neck. Id.

On February 5, 1997, Dr. Marc Sloan of the Pain and Rehabilitation Clinic of Chicago performed an "independent medical examination" of Parris. Parris performed normally when asked to lift her arms, flex and extend her neck, and rotate her head from side to side. (R. 241-42) These movements failed to produce any vertigo or loss of balance. Id. Motor strength of the upper extremities was equal and symmetric. (R. 242) He also stated that Parris did not report any upper extremity weakness or numbness. (R. 241-42) Dr. Sloan concluded that the EEG, MRI of the brain, MRIs of the cervical spine, and brain stem evoked potentials and audiometric studies failed to "give any indication to underlying pathology which may cause her complaints." (R. 242). Irregular findings revealed by MRIs of the cervical spine did not cause "great concern." Id. He diagnosed "vertigo of unknown origin." (R. 242) He also noted that Parris suffered from "left high frequency sensory neural" hearing loss, but was unable to determine its cause. (R. 242) Dr. Sloan recommended vestibular exercises and Meclozine. Id. He also stated that if Meclozine failed to provide relief, Parris should try a migraine headache treatment regimen. Id.

In 1997, Parris was examined by Dr. John Zappia and Dr. Alan Micco at the Chicago Otology Group for her complaints of left-sided tinnitus and hearing loss. (R. 186) A prior audiogram performed in March of 1995, indicating moderate left-sided hearing loss, was noted. (R. 182) An audiogram on April 16, 1997 found that hearing loss in the left ear was "measurably worse" compared to the test performed two years prior. (R. 182-83) Another audiogram performed on October 16, 1997 also indicated left-sided hearing loss, but the audiologist had some questions of reliability. (R. 175) Dr. Micco stated that Parris' hearing loss

-6-

did not in and of itself prevent her from functioning well. (R. 176). Parris was not interested in taking medication for the tinnitus because of sedative effects, so Dr. Micco recommended a hearing aid instead. Id.

In 1999, Dr. Michael Kelly, a chiropractor, stated that Parris continued to suffer from a cervical strain/sprain injury to her neck that affected her proprioceptive input from her cervical spine to her brain. (R. 209) Dr. Kelly stated: "This chronic condition has caused numerous loss of balance episodes with falls to the ground and head injuries." (R. 209) Dr. Kelly stated that Parris had a permanent disability which was degenerative in nature and with symptoms expected to worsen over time. He also stated that the episodes of loss of equilibrium and resulting injury will also increase. (R. 209) Dr. Kelly stated that Parris need to receive disability benefits in order to avoid "further injury to herself and to avoid injury and loss of property to others." (R. 209)

On April 18, 2000, an x-ray of Parris' left knee found "mild degenerative changes" involving two joint compartments. (R. 262) No evidence of acute fracture or dislocation was found. "Mild osteopenia" was noted. (R. 262) Dr. J. Damergis characterized the results of the x-ray of the left knee as "unremarkable." (R. 249). Additional physical therapy for Parris' knee pain commenced on April 25, 2000. (R. 282-83) Parris reported continued pain and weakness in her left knee at the hearing before the ALJ in January, 2001. (R. 50)

**B.    Other Evidence**

On January 9, 1998, Mr. Jerry Adato, Director of Rehabilitation for Adato Vocational Services, prepared a report that found that Parris had a permanent partial disability rating of 40% for the whole body. (R. 157) The equilibrium impairment comprised 75% of this rating. Id. The rating did not include a hearing impairment. Id. Mr. Adato found that possible job

descriptions would include a check out teller or receptionist or working at a computer terminal, as long as no overhead lifting or climbing of ladders was required. Id. He ultimately concluded, however, that Parris did not have a "safe worker profile" and would be "a liability to herself and any employer." (R. 158) Mr. Adato stated: "Even the suggested jobs promulgated by Dr. Kelly involve risk if she is falling with little warning." Id. Mr. Adato further stated, "I do not believe she can work on an uninterrupted basis with the multiple problems she is having. I believe that she should be evaluated for attendant care as she has been unable to keep her house and drive." Id.

## C.    Testimony at the Administrative Hearing

Valarie Parris, her husband Richard Hargreaves, and vocational expert GleeAnn Kehr testified at the hearing held before Administrative Law Judge John Mondi on January 9, 2001. (R. 41)

Parris testified that from December, 1989 until September, 1990 she worked full time as a receptionist at a health club. (R. 48) At that time, she did not suffer from loss of balance or other problems because that was before she got injured. (R. 49) From October of 1992 until December of 1995, she worked full time for "Crafts and Stuff" as a floral designer. (R. 46) Her manager discharged her because she kept falling and injuring herself at work and was a hazard to herself and others. (R. 46-47) Since then, she has looked for work in the art field and for any sit down office work that does not require typing, computers, or phones. (R. 45) She applied for work at McDonald's but was turned away because she was "dangerous." Id.

Parris said that her doctors determined that she loses her balance and falls because of "whatever is messed up in my neck." (R. 49) She was unwilling to consent to exploratory surgery of her neck because her doctors were not sure it would benefit her and death or paralysis

could result. (R. 49-50) She stated that her falls have knocked loose several of her teeth. (R. 49) In response to the question, "[A]re there any other [problems] that have been suggested?," Parris answered that she had two torn rotator cuffs and arthritis. (R. 50) She also stated that her left knee hurt a great deal and sometimes gave out. Id. She reported that there was "a lot of noise" in her left ear and that her hearing in that ear was "gone." Id. She does not wear a hearing aid because neither her insurance company nor worker's compensation would pay for it. Id. Parris said that she had discontinued some medicines she was supposed to be taking because she has difficulty paying for her prescriptions, medical bills, and dental bills. (R. 53, 66) Parris reported that she got headaches three to four times a week, which she treated with Tylenol and Vicoprofen. (R. 62, 53) Sometimes Parris takes up to eight Tylenol in eight hours, since her doctor told her it was safe to exceed the recommended dosage as needed for pain. (R. 62, 65) She only takes Vicoprofen if Tylenol affords no relief because she is concerned about becoming addicted. (R. 65) Her headaches last anywhere from five to six hours to two to three days. Id She also has pain from her right shoulder to her elbow and in her right wrist. (R. 68) She has arthritis and pain in both hands and her fingers are starting to curl. Id. She has difficulty holding onto objects with either hand. (R. 69) She was unsure how often she lost her balance and fell, but said sometimes it could be as much as a couple of times a day. (R. 56) When asked whether she would characterize her situation as stable, getting better or getting worse, she said it was stable. (R. 57)

Parris is generally able to take care of herself. She has fallen in the shower a few times and no longer showers unless someone else is in the house. (R. 56) She does not walk long distances. (R. 51) She is unable to stand for long periods because of her balance problems. (R. 51) She does not have problems with sitting. (R. 52) She stated that she was unable to lift more

than five pounds and nothing over shoulder level, but she later answered that she could lift a gallon of milk using both hands. Id. She said she has been told not to reach above her shoulders or below her waist in order to avoid putting her neck out. (R. 68) She has difficulty sleeping. (R. 53)

Parris lives with her husband, daughter, and her two grandchildren. (R. 55) She has given up on most forms of housework and does not do any yardwork. (R. 62) If there is an emergency, she will take the family's large dogs out to the yard, but she tries to avoid that as well. (R. 63) She stopped doing the dishes because she frequently dropped and broke them. Id. She does a little cooking, but her daughter and her husband do most of it. (R. 64) She is unable to vacuum or sweep floors. (R. 68) Her daughter does the laundry. (R. 56)

Parris' doctor told her to stop driving after she lost her balance behind the wheel and drove off the road. (R. 54) She admitted that once in a while she still drives three blocks to the gas station to buy cigarettes. (R. 56-57) She goes to the store once every couple of months, usually with either her husband or her daughter. (R. 57) Tinnitus makes it difficult for her to concentrate while talking on the phone. (R. 67-68) She occasionally goes to dinner with her husband, Richard. (R. 57) Richard participates in civil war reenactments, and Parris has joined him in camping out for these events. When they camp, Parris does not do any of the cooking and does not pitch or strike the tent. (R. 57) Parris tries to do needlepoint, but she is only able to work on it for a few minutes at a time without hurting her neck. (R. 69-70) Her last project, a tea cozy, took over a year to complete. (R. 69)

Richard Hargreaves testified that when he and Parris go out, she hangs on his arm in order to keep from falling. (R. 58) She often falls into the walls when they are at home and walks with her hand against the wall to steady herself. Id. He estimates that she actually falls to

the ground maybe a couple of times a week, but she loses her balance or falls into a wall every day. (R. 59) He is at work during the day, and only hears about some of the falls after they have happened. Id. He last saw his wife fall to the ground sometime the previous autumn. (R. 60) He said that she has not used a cane for support since 1996 or 1997. (R. 59) He testified that Parris does not use drugs other than over-the-counter and prescription medication and takes a drink of alcohol maybe twice a year. Id. He said she drinks coffee "constantly." (R. 59-60) He also stated that Parris has looked for work, but "as soon as she put on her application that she did have some medical problems, [] we've never got a call back from anybody." (R. 60)

GleeAnn Kehr, a vocational expert, testified that Parris' former job as a floral designer was semi-skilled in nature and heavy in physical demand as reported. (R. 72) She stated that the job as a health club receptionist was light in physical demand and unskilled in nature. (R. 72) Her job as a clerk in a framing store was medium in demand and semi-skilled in nature. (R. 72) Neither the floral design nor framing skills are transferable to other types of semi-skilled positions. (R. 72)

The ALJ posed three hypothetical questions to the vocational expert. First, he asked whether a person of Parris' age and with her work history and educational level could perform any past work if she was limited to light work and could not reach above her shoulders or below her waist, was unable to work at heights or around dangerous machinery, unable to climb ladders, ropes, or scaffolds, and had spells of dizziness once every two weeks. Kehr replied that under these restrictions, Parris could not return to floral design as it is done in the national economy. (R. 73) Kehr stated that Parris might be able to return to work as a health club receptionist, but that "[i]t's hard to say if in most areas... the shelving would be overhead or below waist. However, that - you know, any reaching - that would be the biggest, the biggest

difficulty." (R. 72-73)

Second, the ALJ asked Kehr what past relevant work such a hypothetical person could perform if she was limited to sedentary rather than light work. (R. 73) Kehr replied that Parris would not be able to perform any past relevant work. Id.

Third, the ALJ asked Kehr what the vocational outlook would be if he gave full credit to the testimony offered at the hearing and found that Parris' capabilities and limitations were as she claimed. (R. 73) Kehr replied that "when someone needs to sit the bulk of the day and also has difficulty in grasping or dexterity, then it generally precludes all competitive employment just due to the nature of sedentary work." Id. Kehr stated that Parris' limitations, if fully credited, would preclude all work. Id.

## DISCUSSION

### A. Standard of Review

The Social Security Act provides that the Commissioner's findings of fact are conclusive "if supported by substantial evidence." 42 U.S.C. § 405(g) (2000). Substantial evidence means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971). The Court may only reverse the Commissioner's decision "if the evidence 'compels' reversal, not merely because the evidence supports a contrary decision." Betancourt v. Apfel, 23 F. Supp. 2d 875, 880 (N.D. Ill. 1998) (quoting I.N.S. v. Elias-Zacarias, 502 U.S. 478, 481 (1992)). This does not mean, however, that this Court will simply "rubber stamp the Commissioner's decision without a critical review of the evidence." Clifford v. Apfel, 227 F.3d 863, 869 (7th Cir. 2000).

Furthermore, a denial of benefits "must be based on consideration of all relevant evidence and the reasons for [the ALJ's] conclusion must be stated in a manner sufficient to

permit an informed review." Ray v. Bowen, 843 F.2d 998, 1002 (7th Cir. 1988). The ALJ may not limit his analysis to "only that evidence which favors his ultimate conclusion;" rather, he must articulate at some "minimum level" his analysis of the evidence presented to counter the agency's position. Id. (citations omitted).

## B.    Five Step Inquiry

In order to receive DIB benefits under Title II of the Social Security Act, a claimant must establish her inability to perform "any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 20 C.F.R. § 416.905 (2004). In order to determine whether a claimant is disabled within the meaning of the Act, the ALJ conducts a five-step inquiry: (1) whether the claimant is currently gainfully employed; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals any of the listings found in the regulations, see 20 C.F.R. § 404, Subpt. P, App. 1 (2004); (4) whether the claimant is able to perform her former occupation; and (5) whether the claimant is able to perform any other available work in light of her age, education, and work experience. 20 C.F.R. § 404.1520(a) (2004); Clifford, 227 F.3d at 868. These steps are to be performed sequentially. 20 C.F.R. § 404.1520(a). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." Clifford, 227 F.3d at 868 (quoting Zalewski v. Heckler, 760 F.3d 160, 162 n.2 (7th Cir. 1985)).

## C.  The ALJ's Findings

The ALJ denied Parris' claim at step two, finding that she failed to establish a "medically determinable impairment that produces more than a minimal effect on the claimant's ability to do basic work activities." (R. 18). He found Parris' testimony and that of her husband not credible, largely because he found that the objective medical evidence did not support Parris' representations as to her limitations. (R. 18, 19, 20) Additionally, he found that even if Parris did have a severe impairment at step two, her claim would be denied at step four based on the vocational expert's testimony that she could return to her past unskilled work as a health club receptionist. (R. 20) The ALJ found that Parris "was not under a 'disability,' as defined in the Social Security Act, at any time through the date of his decision." (R. 21)

## D.  Analysis

Two main issues are before this Court on appeal: (1) whether the ALJ's finding at step two is supported by substantial evidence and (2) whether the ALJ's alternative step four finding that Parris was capable of returning to past relevant work as a health club receptionist is supported by substantial evidence. The Court addresses each issue in turn.

### 1.  Step Two

The ALJ found that Parris failed to prove at step two the existence of a medically determinable impairment that produces more than a minimal effect on the claimant's ability to do basic work activities. Step two of the five step inquiry requires the claimant to show that she has a severe impairment. Step two states: "If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment and are, therefore, not disabled." 20 C.F.R. § 404.1520(c). "Basic work activities" means "the abilities and aptitudes

-14-

necessary to do most jobs," including physical functions such as standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling, capacity for hearing, and mental functions such as understanding and remembering simple instructions. § 404.1521(b). An impairment is not severe if the "medical evidence establishes only a slight abnormality or combination of slight abnormalities which would have no more than a minimal effect on an individual's ability to work." Soc. Sec. Ruling 85-28.

Parris argues that the ALJ improperly discussed the evidence in a selective fashion in finding her not disabled at step two. The ALJ may not "select and discuss only that evidence that favors his ultimate conclusion." Herron v. Shalala, 19 F.3d 329, 333 (7th Cir. 1994). "Both the evidence favoring the claimant as well as the evidence favoring the claim's rejection must be examined, since review of the substantiality of evidence takes into account whatever in the record fairly detracts from its weight." Bauzo v. Bowen, 803 F.2d 917, 923 (7th Cir. 1986). The Seventh Circuit has made clear that the "ALJ's decision must be based upon consideration of all the relevant evidence, and that the ALJ 'must articulate at some minimal level his analysis of the evidence.'" Herron, 19 F.3d at 333. Failure to consider an entire line of evidence falls below the minimal level of articulation required. Diaz v. Chater, 55 F.3d 300, 307 (7th Cir. 1995). Moreover, "more weight is generally given to the opinion of a treating physician because of his greater familiarity with the claimant's condition and circumstances," unless it is not supported by medical findings or is inconsistent with other substantial evidence in the record. Clifford, 227 F.3d at 870.

The ALJ gave two main reasons for finding Parris' impairments not severe. The ALJ found that the record failed to include objective medical findings supporting Parris' representations as to her limitations and frequent falls. The ALJ further found Parris' testimony

regarding her pain and functional limitations not credible. The ALJ's conclusion that Parris did not have a medically determinable impairment or combination of impairments that significantly limit her ability to perform basic work activities is not supported by substantial evidence because the ALJ failed to discuss substantial objective medical evidence supporting Parris' claim. The reasons cited by the ALJ in support of his credibility finding are also problematic.

In March 1995 and April 1996, Parris underwent MRIs of the cervical spine, which revealed mild to moderate abnormal findings. (R. 200, 232). The ALJ did not mention the irregular results of either of the cervical spine MRIs in his decision. Rather, the ALJ noted that Dr. Sloan opined that the MRI of the cervical spine did not indicate the pathology underlying Parris' complaints and the findings of the MRI of the spine on two occasions did not cause Dr. Sloan "great concern." (R. 19, 242).

The ALJ improperly ignored the opinions of several of Parris' treating physicians, which identified abnormalities in Parris' cervical spine as the underlying cause of many of her complaints, in favor of Dr. Sloan's conclusion based on one visit that Parris' cervical abnormalities were not of "great concern," and her complaints were of unknown origin. The ALJ failed to note that several of Parris' other doctors - including her neurologist (Dr. Ubilluz), an orthopaedic surgeon (Dr. Gogan), and a chiropractor (Dr. Woods) - interpreted the MRI as explaining the source of her disequilibrium and her head, neck, and right arm pain. On January 11, 1995, Dr. Gogan opined that the MRI of January 9, 1995 was consistent with herniated discs and her chronic right arm pain. (R. 229). On January 18, 1995, Dr. Woods noted that Parris had a chronic condition including pain in her neck radiating between her shoulder blades and causing severe occipital headaches and the two herniated discs evident on the January 9, 1995 MRI were responsible for this chronic condition. (R. 222). On April 24, 1996, Dr. Ubilluz diagnosed a

-16-

sprain/strain of the neck and cervical vertigo producing a disequilibrium and unsteadiness based on a April 3, 1996 MRI of the cervical spine. (R. 199).

The ALJ failed to address additional medical findings regarding Parris' cervical disc abnormalities and neck injury which support her claim. On July 7, 1994, Dr. Pellegrino, a chiropractor, diagnosed cervical sprain with cervical brachial syndrome. (R. 220). Dr. Pellegrino opined that Parris' injury to the mid-cervical region was associated with radiation of pain and numbness to the left upper extremity. Id. In June of 1996, Drs. Humphreys, Shelton, and Iravedra's findings after examination and testing were consistent with cervical segmental dysfunction secondarily resulting in disturbed equilibrium. (R. 170). On February 5, 1998, Dr. Micco, an otolaryngologist, stated that a flexion-extension injury of the head and neck could have caused Parris' hearing loss and her severe disequilibrium is probably the result of this type of injury. (R. 174).

Finally, on December 29, 1999, Dr. Kelly (Parris' treating chiropractor since May 1995), opined that she had a loss of proprioceptive input from her cervical spine to her brain as a result the October 1993 cervical strain/sprain injury to her neck. (R. 209). Dr. Kelly opined that Parris has a chronic condition and her symptoms are expected to worsen over time. Id. With respect to Dr. Kelly, the ALJ stated only that he accorded reduced weight to his opinion that Parris is disabled for "a number of reasons, including the lack of supporting objective findings." (R. 20). As detailed above, objective findings supporting Parris' claim are present in the record. Moreover, the Court is left to guess what exactly the other reasons are for the ALJ's failure to credit Dr. Kelly's findings because the ALJ provided no further reasons.[1]

---

[1] The Commissioner argues that the ALJ properly rejected the opinion of Dr. Kelly because a chiropractor is not considered an acceptable medical source. 20 C.F.R. § 404.1513(a). The

As stated above, although the ALJ need not provide a written evaluation of each piece of evidence in the record, he can not select and discuss only that evidence that favors his ultimate conclusion. Because the ALJ does not explain why he ignored the irregular MRIs of the cervical spine and the diagnoses of Parris' treating physicians, his sole reliance on Dr. Sloan's opinion that Parris' spinal irregularities are not the cause of her symptoms is not supported by substantial evidence.

The ALJ also found at step two that Parris' testimony lacked credibility. (R. 18-19) An ALJ's credibility determination will be reversed only when it is "patently wrong." Herr v. Sullivan, 912 F.2d 178, 181 (7th Cir. 1990). While the ALJ's credibility findings are usually entitled to great deference, "when such determinations rest on objective factors or fundamental implausibilities rather than subjective considerations [such as a claimant's demeanor], appellate courts have greater freedom to review the ALJ's decision." Herron, 19 F.3d at 335.

In determining that Parris was not credible, the ALJ noted:

> the lack of supporting objective medical findings and the disproportionate use of medication and pursuit of treatment as well as the claimant's activities that include driving (despite not having a license), going alone at times to the store, and even camping. Also noteworthy is the inconsistency between the claimant's having balance problems and, yet, having stopped using a cane years ago after her knee healed.

(R. 18-19)

The ALJ's credibility determination is not supported by substantial evidence. First, an ALJ must examine "the full range of medical evidence" before finding that a claimant lacks

---

Commissioner's argument is unpersuasive as justification for the ALJ's decision. First, the ALJ did not state that he rejected Dr. Kelly's opinion because Dr. Kelly was not an acceptable medical source. Moreover, a chiropractor's opinion may be used to "show the severity of [a claimant's] impairments and how it affects [her] ability to work." 20 C.F.R. § 404.1513(d).

credibility due to inconsistency between reported symptoms and objective medical evidence. Zurawski v. Halter, 245 F.3d 881, 887-88 (7th Cir. 2001). Because of the problems noted above with the ALJ's analysis of the medical evidence, this Court cannot uphold lack of medical evidence as grounds for the ALJ's credibility finding.

Second, an ALJ "must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record that may explain infrequent or irregular medical visits or failure to seek medical treatment." Social Security Ruling 96-7p. It may be necessary for the ALJ to question the individual at the administrative hearing or to recontact the individual in order to ascertain whether there are good reasons that the individual does not seek medical treatment in a consistent manner. Id. Explanations which may provide insight into the individual's credibility include not taking prescription medication "because the side effects are less tolerable than the symptoms" or not seeing a doctor because the individual is "unable to afford treatment and may not have access to free or low-cost medical services." Id.

Although the ALJ said that Ruling 96-7p informed his credibility determination, he did not follow the guidelines established therein. (R. 18) He found Parris' complaints of pain and functional limitation not credible in light of her "disproportionate use of medication and pursuit of treatment." (R. 18-19). Parris testified that she tries not to take prescription pain medication as it is addictive and that financial concerns have affected her ability to seek medical care, a hearing aid, and obtain medications. (R. 50, 53, 62, 65, 66) Parris testified that she had "horrible" health insurance that does not "cover anything" and she stopped taking medication that has been prescribed for her because she cannot afford it. (R. 53, 66) The ALJ failed to ask

-19-

Parris any questions as to why she had not pursued certain treatments or taken certain medications. In making his credibility determination, the ALJ never noted Parris' explanations. The ALJ did not properly follow the Social Security Administration's guidelines for exploring this issue before finding that Parris' "disproportionate" pursuit of treatment and use of medication made her impairment claims less credible.

Third, the ALJ found some of Parris' activities "inconsistent" with her claimed impairments, namely "driving (despite not having a license), going alone at times to the store, and even camping." (R. 19) "Minimal daily activities . . . do not establish that a person is capable of engaging in substantial physical activity." Clifford, 227 F.3d at 872. Parris testified that "once in a while" she drives three blocks to the gas station to get a pack of cigarettes and once every couple of months she goes to the store usually with her husband or daughter. (R. 56-7). She stated she does not go the mall to shop. (R. 51) She does all of her shopping through catalogs or the home shopping channel. Id. Parris also indicated that her daughter did the family laundry and "once in a blue moon" Parris starts a load or checks a load for her daughter. (R. 56, 64). She further stated that she has "given up most forms of housework" and does not do yard work. (R. 62). Parris sometimes washes dishes. (R. 63). Parris testified that her husband puts the dishes away, her husband and daughter do most of the cooking, her grandson does the vacuuming and usually takes the family's dogs out, her granddaughter brings the dogs in, her daughter and husband feed the horses and chickens, her daughter, grandson, and granddaughter clean the barns and the coops, and her husband and grandson take turns cutting the grass. (R. 64). Parris' testimony regarding her daily activities does not undermine her claimed pain and limitations. See Clifford, 227 F.3d at 872.

Furthermore, the ALJ must explain how activities of daily living are inconsistent with complaints of pain and the medical evidence when finding that such activities defeat credibility. Zurawski, 245 F.3d at 887. In Zurawski, the Seventh Circuit held that the fact that the claimant was able to wash dishes, help his children prepare for school, do laundry, and prepare dinner did not necessarily undermine or contradict his claim of disabling pain, particularly when the ALJ did not explain *how* these activities were inconsistent with his claim. Id. In this case, the ALJ similarly concluded that Parris' activities undermined her credibility without explaining how the activities were inconsistent with Parris' claim. (R. 19) For example, the ALJ omitted the fact that while Parris has gone camping with her husband on occasion, she does not do any of the cooking nor does she pitch or strike their tent. (R. 57) Since there is no further testimony in the record about what Parris *does* do when they are camping, it is impossible to ascertain why the fact that Parris engages in this activity led the ALJ to question her veracity.

The final ground for the ALJ's credibility finding is that Parris stopped using a cane years ago in spite of her claimed balance problems. (R. 19) "ALJs must not succumb to their temptation to play doctor and to make their own independent medical findings." Rohan v. Chater, 98 F.3d 966, 970 (7th Cir. 1996). None of the doctors who have treated Parris recommended that she use a cane to help with her balance problems. Parris' failure to use a cane has no bearing on the credibility of her testimony regarding her symptoms and limitations. For these reasons, the grounds given by the ALJ are insufficient to support his credibility finding.

2. **Step Four**

After denying Parris' claim at step two, the ALJ made an additional finding that Parris' claim also failed at step four.[2] (R. 20). At step four, the ALJ found: "It is noted that even if the claim were not being denied at step 2 and even assuming the claimant were found to be limited to light work, subject to spells of dizziness every two week[s] (based on Exhibit 3F/8), the vocational expert testified that she could return to her past light, unskilled work as a health club receptionist." (R. 20). The ALJ's alternative finding that Parris would be capable of performing her past relevant work as a health club receptionist is not supported by substantial evidence.

First, the ALJ based this finding on testimony from the vocational expert indicating that the claimant could perform past relevant work as a health club receptionist. The VE's testimony is as follows:

> ALJ: ... The first question, if I were to find that the hypothetical person was limited to no more than light work and also limited to reaching to no higher than shoulder level or no lower than waist level, and unable to work at heights or around dangerous machinery, and unable to climb ladders, ropes, or scaffolds. And had spells of dizziness once every two weeks, could that person return to her past work?

> VE: The position as health club receptionist generally falls into that category. It's hard to say if in most areas, you know, shelving would be overhead or below waist. However, that - you know, any reaching - that would be the biggest, the biggest difficulty.

(R. 72-73) According to the VE, if shelving for towels was above shoulder level or below waist level, then Parris would not be able to perform work as a health club receptionist. The ALJ failed to cite any evidence indicating that the health club receptionist job as Parris had performed

---

[2]In making his determination, the ALJ improperly skipped step three of the analysis, which requires him to assess whether Parris' impairment meets or equals any of the impairments listed by the Commission. The ALJ is required to perform the five-step evaluation *in sequence* and is not allowed to skip step three. Zurawski, 245 F.3d at 885; see also 20 C.F.R. § 404.1520 (stating "[w]e follow a set order to determine whether you are disabled.").

it did not require reaching overhead or below the waist. Moreover, the VE was unable to state whether the position of health club receptionist as it is generally performed in the national economy requires reaching above shoulder level and below waist level. The VE's equivocal testimony is not evidence that a reasonable mind might accept as adequate to support the ALJ's conclusion.

The ALJ's step four conclusion was also reached without a thorough analysis of Parris' residual functional capacity ("RFC"). Rice v. Barnhart, 384 F.3d 363, 365 (7th Cir. 2004) (stating "the fourth step requires an assessment of whether the claimant's residual functional capacity will allow the claimant to pursue her past work."). The RFC is a description of those work activities a claimant can perform despite her limitations. Dixon v. Massanari, 270 F.3d 1171, 1178 (7th Cir. 2001). "Light work" involves (1) lifting or carrying ten pounds frequently; (2) lifting twenty pounds occasionally; (3) standing or walking, off and on, for six hours during an eight-hour workday; (4) intermittent sitting; and (5) using hands and arms for grasping, holding, and turning objects. Zurawski, 245 F.3d at 886 n. 6; 20 C.F.R. § 404.1567(b) (2004). In assessing the claimant's RFC, the ALJ must consider both the medical and nonmedical evidence in the record. See 20 C.F.R. § 404.1545.

Here, the ALJ did not make an explicit RFC finding. Implicit in the ALJ's step four denial is a finding that Parris' RFC is as described in his hypothetical question, i.e. the ability to perform light work and also limited to reaching no higher than shoulder level or no lower than waist level, unable to work at heights or around dangerous machinery, unable to climb ladders, ropes, or scaffolds, and had spells of dizziness once every two weeks. The ALJ's opinion fails to review the relevant evidence that led to his apparent RFC conclusion. The ALJ's failure to adequately support his RFC finding prevents the Court from finding that substantial evidence

-23-

supports his finding at step four. The ALJ failed to build the "accurate and logical bridge from the evidence to [his] conclusion" that is necessary for meaningful appellate review. Dixon, 270 F.3d at 1176. On remand, a more thorough step four evaluation is necessary, should the analysis proceed beyond step three.

Two final points merit mention. First, the ALJ "noted" in his decision that Parris' caffeine consumption could be contributing to some of her "reported problems." (R. 19) There is no medical evidence in the record suggesting that Parris' caffeine consumption is problematic or should be curtailed. The ALJ improperly played doctor and made his own independent medical finding regarding the cause of some of Parris' "report problems." Second, with respect to an outdoor fall to the ground by Parris described by her husband, the ALJ opined that terrain could have been a contributing factor. There is nothing in the record to support the speculative comment by the ALJ that terrain may have been a factor in the fall described by Parris' husband. Parris' husband testified only that at the time of the fall, they were in the yard or in the barn. There is no further testimony in the record regarding the terrain.

## CONCLUSION

For the reasons stated above, Plaintiff's Motion for Summary Judgment or Remand is granted, and the Commissioner's Motion for Summary Judgment is denied. The ALJ's decision is reversed and the case is remanded to the Social Security Administration for further proceedings consistent with this opinion. This Court suggests that the Social Security Administration transfer the case to a different ALJ on remand. See Sarchet v. Chater, 78 F.3d 305, 309 (7th Cir. 1996).

E N T E R:

Nan R. Nolan

**Nan R. Nolan**
**United States Magistrate Judge**

Dated: 12/28/04